1

2

3

4

5

6

7

8                    IN THE UNITED STATES DISTRICT COURT

9              FOR THE NORTHERN DISTRICT OF CALIFORNIA

10

11   MILAN PAKES,                          No. CV 11-05284 CRB

12              Petitioner,                 **ORDER DENYING PETITION FOR A
                                            WRIT OF HABEAS CORPUS**
13        v.

14   P.D. BRAZELTON,

15              Respondent.
     _____/

16

17        Milan Pakes, a state prisoner at Pleasant Valley State Prison, seeks a writ of habeas

18   corpus under 28 U.S.C. § 2254 invalidating his conviction and sentence from Santa Clara

19   County Superior Court on a host of grounds.  For the reasons that follow, the Court DENIES

20   his petition.

21   **I.    STATEMENT OF THE CASE**

22        Pakes was charged in July 2002 with annoying or molesting a minor, Cal. Penal Code

23   § 647.6(c)(2), child endangerment, id. § 273(a), evading a police officer, Cal. Vehicle Code

24   § 2800.2, and misdemeanor hit-and-run, id. § 20002(a). Resp. Ex. 2 at 199-203.  He pled

25   guilty in October 2002 to felony child endangerment, and admitted allegations that he had

26   two prior strikes and a prior prison term.  People v. Pakes, No. H032734 (Santa Clara Cnty.

27   Sup. Ct. Oct. 16, 2009), Resp't Ex. 9, at 2.  Pakes unsuccessfully moved to dismiss the

28   strikes under People v. Superior Court (Romero), 13 Cal. 4th 497 (1996), and was sentenced

to 26 years to life.  Id.  His conviction was affirmed on state appellate and collateral review.  Id.

In June 2007, a federal district court granted Pakes' petition for a writ of habeas corpus based on his trial counsel's ineffectiveness in advising Pakes to accept a plea deal.  Resp't Ex. 2, 1 CT 2-16.  Pakes then proceeded to trial back in state superior court in November 2007,[1] where a jury found him guilty of child endangerment and evading a police officer, both felonies, and misdemeanor hit-and-run.  Id. at 262-69.  Pakes admitted the prior conviction allegations, id. at 268, and the court sentenced him to a term of 29 years to life in prison, id. at 339-45.

Pakes appealed and sought habeas relief in state court.  On direct review, the court of appeals largely affirmed Pakes' conviction, but remanded on a sentencing issue not pertinent to the present petition.  Resp't Ex. 9 at 27-29.  The California Supreme Court denied Pakes' petition for review of the direct appeal.  Resp't Ex. 13.  On Pakes' habeas petition, the appellate court issued an order to show cause returnable to the superior court on the claim that Pakes' counsel was ineffective for entering into a particular stipulation at trial.  Resp't Ex. 11.

On remand, the trial court resentenced Pakes to 25 years to life, Resp't Ex. 14 at 2, and rejected Pakes' habeas claim concerning his trial counsel's stipulation, Resp't Ex. 12.  The state intermediate appellate court affirmed the new sentence with a modification to the abstract of judgment, Resp't Ex. 14, and denied Pakes' renewed habeas petition, see Resp't Ex. 16.  The California Supreme Court denied Pakes' petition for review of the denial of his habeas petition.  Resp't Ex. 18.

Pakes now seeks a writ of habeas corpus in this Court, where it is undisputed that he properly exhausted his avenues for relief in state court on all of the claims raised in his petition.

//

United States District Court
For the Northern District of California

---

[1]The record indicates that the trial court granted a defense motion to dismiss the charge of annoying or molesting a minor.  Resp't Ex. 2, 2 CT at 258.

**United States District Court**
For the Northern District of California

## II.     STATEMENT OF FACTS

Though the bulk of Pakes' claims turn on the conduct of the lawyers for both sides during the trial, a recounting of the evidence underlying his convictions informs the issue of prejudice and provides helpful context for the litigation decisions Pakes challenges. The state appellate court summarized the facts as follows:

Sometime during the summer of 2001, 12-year-old Adrienne F., who lived with her family in a mobile home park, met defendant. Defendant then became a friend to the F. family, and would spend time "24/7" with Adrienne, her father, and her sister at their home. He was at their home every day when he was not working, and he would also occasionally spend the night there.

Defendant drove a pickup truck. In late 2001, he was teaching Adrienne how to drive. He allowed her to drive the truck around the mobile home park on more than 10 occasions. Adrienne did not wear a seatbelt, because defendant told her that the clips did not work.

On December 14, 2001, defendant spent the night at the F. home. The following day, he invited Adrienne to go with him on a chimney sweeping job. After her parents gave her permission to go with defendant, Adrienne and defendant left the mobile home park at 2:30 p.m. Defendant and Adrienne left the job site after a couple of hours. At about 5:00 or 6:00 p.m., defendant was driving his truck on Highway 87. Adrienne was not wearing a seatbelt. When the traffic became heavier near Curtner Avenue, defendant suddenly slammed on his brakes and hit the SUV in front of him.

David Gonazalez, an off-duty police officer, was driving the SUV. Officer Gonzalez, who had been driving slowly in the left lane at the time of the collision, pulled over to the center shoulder and rolled down his passenger window as defendant pulled abreast of the SUV. Defendant also rolled down his window. Officer Gonzalez asked defendant to pull over so they could exchange information, because his vehicle had been damaged. Defendant agreed to do so.

Defendant drove onto the left shoulder in front of Officer Gonzalez. However, he did not stop. Instead, he drove "[r]eally fast" on the shoulder. [Footnote in original: Officer Gonzalez estimated that defendant was driving on the shoulder at 40 to 50 miles per hour.] Officer Gonzalez "didn't want to go too fast on the shoulder, but [he] stayed where [he] could see him, less than a quarter mile." When traffic cleared, defendant swerved back into the left lane and continued to go north on Highway 87. He was weaving in and out of traffic, and he cut off at least five cars, forcing them to slam on their brakes to avoid him. Officer Gonzalez used his cell phone to report to the police dispatcher that defendant had failed to stop after an accident. Officer Gonzalez could see Adrienne sliding from side to side inside defendant's truck. Adrienne was "really scared." She screamed at defendant to take her home and to stop and pull over. She also told him that it would just get worse if he kept going. Defendant told her to "shut up and duck down so they don't see you."

Defendant exited Highway 87 onto southbound Highway 280, and cut off two or three cars. Defendant continued to weave between lanes before he exited onto Sixth Street. [Footnote in original: The exit is labeled Seventh

3

**United States District Court**
For the Northern District of California

1    Street, but it actually leads to Sixth Street.]  Officer Gonzalez exited the
2    highway about 20 seconds after defendant and followed him on surface streets
     until he saw a marked police car at Second or Third Streets and Keyes Street.

3        Sergeant Robert St. Amour was driving a marked police car around 5:45
     p.m. when he heard the dispatch to be on the lookout for defendant's truck.  As
4    Sergeant St. Amour was driving on First Street, he saw defendant's truck
     driving west on Humboldt Street.  Humboldt is one-way in the other direction.
5    Defendant then turned north on Second Street which is one-way southbound.
     Three or four cars were traveling south on Second Street at that time.
6    According to Adrienne, one of the cars was forced to swerve out of the way.
     Sergeant St. Amour was able to watch defendant, because First and Second
7    Streets are separated by a park that is no more than 30 feet wide.

8        As Sergeant St. Amour turned from First Street onto Keyes Street and
     headed to Second Street, he activated his red lights and siren.  The officer
9    reached the intersection of Second Street and Keyes Street before defendant,
     who was 75 to 100 feet from the intersection.  He positioned his patrol car
10   across the end of Second Street, thereby blocking the center lane and portions
     of the right and left lanes.  Defendant continued driving the wrong way towards
11   the patrol car.  There was just enough room between the end of the patrol car
     and the curb for defendant to turn right on Keyes Street.  Sergeant St. Amour
12   started to follow defendant on Keyes Street.  However, his glasses slipped off
     as he reached for the radio to report the chase, and he was delayed momentarily
13   while he put them back on.

14       Defendant turned left on Third Street.  He was driving 35 miles per hour
     when the posted speed limit was 30 miles per hour.  With his lights and siren
15   activated, Sergeant St. Amour continued to chase defendant.  Defendant turned
     left on Virginia, then turned left on Second Street, heading southbound.  It was
16   dark, and defendant was driving 35 miles per hour on Second Street when the
     posted speed limit was 30 miles per hour.  There was an unsecured ladder in
17   the bed of defendant's pickup truck.  The ladder was hanging over the tailgate
     and sliding with each turn.  According to the officer, defendant's speed was
18   unsafe for the conditions, time, and location.  Defendant then turned left in the
     middle of the block without signaling and drove onto the curb.  Both tires were
19   up on the curb and the truck was sticking out into the street.  Defendant told
     Adrienne to get out of the truck so he could leave.  When Sergeant St. Amour
20   pulled up next to defendant's truck, another patrol car arrived.  As defendant
     ran towards his father's house, Sergeant St. Amour ordered him to stop.
21   Defendant was eventually arrested.

22       The parties stipulated that "the first on-duty police officer in a marked
     police car to encounter the defendant after the defendant's collision with off-
23   duty police Officer Gonzalez's vehicle was Sergeant St. Amour.  There were
     no marked police cars behind the defendant's truck as he drove the wrong way
24   on Second Street."  The parties also stipulated "the defendant admits that he
     intended to flee following the traffic accident with another vehicle because he
25   reasonably believed that if he was apprehended by the police, he would be sent
     to state prison."
26
27       Milan Pakes, defendant's father, testified for the defense.  After
     defendant was arrested, defendant's brother drove the truck while Pakes was in
28   the passenger seat.  Pakes used the seatbelt, which was functional.

     People v. Pakes, 179 Cal. App. 4th 125, 127-29 (Ct. App. 2009).

                                          4

United States District Court
For the Northern District of California

1    **III.    STANDARD OF REVIEW**

2         This court may entertain a petition for a writ of habeas corpus "in behalf of a person in

3    custody pursuant to the judgment of a state court only on the ground that he is in custody in

4    violation of the Constitution or laws or treaties of the United States."  28 U.S.C. § 2254(a).

5         The writ may not be granted with respect to any claim that was adjudicated on the

6    merits in state court unless the state court's adjudication of the claim: "(1) resulted in a

7    decision that was contrary to, or involved an unreasonable application of, clearly established

8    Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a

9    decision that was based on an unreasonable determination of the facts in light of the evidence

10   presented in the State court proceeding."  Id. § 2254(d).

11        "Under the 'contrary to' clause, a federal habeas court may grant the writ if the state

12   court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of

13   law or if the state court decides a case differently than [the] Court has on a set of materially

14   indistinguishable facts."  Williams v. Taylor, 529 U.S. 362, 412-13 (2000).  "Under the

15   'reasonable application clause,' a federal habeas court may grant the writ if the state court

16   identifies the correct governing legal principle from [the] Court's decisions but unreasonably

17   applies that principle to the facts of the prisoner's case."  Id. at 413.

18        "[A] federal habeas court may not issue the writ simply because the court concludes

19   in its independent judgment that the relevant state-court decision applied clearly established

20   federal law erroneously or incorrectly.  Rather, that application must also be unreasonable."

21   Id. at 411.  A federal habeas court making the "unreasonable application" inquiry should ask

22   whether the state court's application of clearly established federal law was "objectively

23   unreasonable."  Id. at 409.

24        The only definitive source of clearly established federal law under 28 U.S.C.

25   § 2254(d) is in the holdings (as opposed to the dicta) of the Supreme Court as of the time of

26   the state court decision.  Id. at 412; Clark v. Murphy, 331 F.3d 1062, 1069 (9th Cir. 2003).

27   While circuit law may be "persuasive authority" for purposes of determining whether a state

28   court decision is an unreasonable application of Supreme Court precedent, only the Supreme

Court's holdings are binding on the state courts and only those holdings need be

"reasonably" applied.  Id.

In determining whether the state court's decision is contrary to, or involved an

unreasonable application of, clearly established federal law, a federal court looks to the

decision of the highest state court to address the merits of a petitioner's claim in a reasoned

decision.  LaJoie v. Thompson, 217 F.3d 663, 669 n.7 (9th Cir. 2000); see, e.g., Avila v.

Galaza, 297 F.3d 911, 918 n.6 (9th Cir. 2002) (treating state court referee's report as the last

reasoned state court decision, where report was summarily adopted by the court of appeal

and petition for review to California Supreme Court was denied without comment); Packer v.

Hill, 291 F.3d 569, 578-79 (9th Cir. 2002) (where state supreme court denied habeas petition

without comment, looking to last reasoned decision of a state court as the basis of the state

court's judgment), rev'd on other grounds, 537 U.S. 3 (2002).  It also looks to any lower

court decision examined and/or adopted by the highest state court to address the merits.  See

Williams v. Rhoades, 354 F.3d 1101, 1106 (9th Cir. 2004) (because state appellate court

examined and adopted some of the trial court's reasoning, the trial court's ruling is also

relevant).

Where the state court disposes of a claim on the merits but gives no reasoned

explanation, and there is no reasoned lower court decision on the claim, § 2254(d) still

applies.  See Harrington v. Richter, 131 S. Ct. 770, 784-85 (2011).  In such a case, a review

of the record is the only means of deciding whether the state court's decision was objectively

reasonable.  See Plascencia v. Alameida, 467 F.3d 1190, 1197-98 (9th Cir. 2006);  Himes v.

Thompson, 336 F.3d 848, 853 (9th Cir. 2003); Greene v. Lambert, 288 F.3d 1081, 1088 (9th

Cir. 2002); Bailey v. Newland, 263 F.3d 1022, 1028 (9th Cir. 2001); Delgado v. Lewis, 223

F.3d 976, 982 (9th Cir. 2000).  Accordingly, when confronted with such a decision, the

district court conducts "an independent review of the record" to determine whether the state

court's decision was an objectively unreasonable application of clearly established federal

law.  Plascencia, 467 F.3d at 1198; Himes, 336 F.3d at 853; Delgado, 223 F.3d at 982;

accord Lambert v. Blodgett, 393 F.3d 943, 970 n.16 (9th Cir. 2004).

1   Where the state court erred under § 2254(d), habeas relief is warranted only if the

2   constitutional error at issue is structural or the error had a "'substantial and injurious effect or

3   influence in determining the jury's verdict.'" Penry v. Johnson, 532 U.S. 782, 795-96 (2001)

4   (quoting Brecht v. Abrahamson, 507 U.S. 619, 638 (1993)).

5   **IV.    CLAIMS AND ANALYSIS**

6       Pakes asserts seven grounds for relief: (1) his trial counsel was ineffective for

7   stipulating that Pakes intended to flee because he reasonably believed he would go to prison

8   if apprehended by the police; (2) the government's failure to provide the defense with a copy

9   of the San Jose Police Department's pursuit policy violated due process under Brady v.

10  Maryland, 373 U.S. 83 (1963), and its progeny; (3) his trial counsel was ineffective for

11  failing to secure a copy of the pursuit policy; (4) the government violated due process by

12  knowingly using false testimony from Officer Gonzalez; (5) he was denied a fair trial as a

13  result of cumulative error; (6) the trial court's jury instruction regarding California's basic

14  speed law violated due process; and (7) the trial court's jury instruction on a traffic violation

15  under § 21650 violated due process.

16      **A.    The Stipulation**

17      This claim arises out of an evidentiary dispute.  Prior to trial, both sides filed motions

18  in limine.  The government sought to introduce evidence of Pakes' prior conviction for a sex

19  offense involving a minor as well as Pakes' two separate admissions to different police

20  officers following his arrest that he fled from the traffic accident because he knew that he

21  was on parole and that one of his parole conditions prohibited him from being in the presence

22  of minors.  The government cited case law suggesting that such evidence was relevant and

23  admissible to show his motive for committing charged offenses, i.e., that Pakes had a more

24  compelling reason to willfully flee in a dangerous manner than a minor fender bender.  See

25  Resp't Ex. 1, 1 CT 143-45 (citing People v. Johnson, 15 Cal. App. 4th 169, 176-77 (Ct. App.

26  1993); People v. Scheer, 68 Cal. App. 4th 1009, 1020 n.2 (Ct. App. 1998); People v.

27  Durham, 70 Cal. 2d 171, 189 (1969)).  The defense moved to exclude the same, arguing

28  chiefly that it was unduly prejudicial.  See Resp't Ex. 1, 1 CT 125-29.

7

United States District Court
For the Northern District of California

At a hearing on the motion in limine, the government reiterated the arguments in its brief.  See Resp't Ex. 2, 2 RT 114-17.  Defense counsel responded that "intent is not an issue, and I'll take it right off the table now.  I'll stipulate to Mr. Pakes' intent. . . . Intent is not an issue in this case because we're not contesting intent.  Mr. Pakes will stipulate, yes, he intended to flee from the police."  Id. at 118-19.  He further argued that the "reason behind it, the motive . . . in this case has no relevance. . . . The fact that Mr. Pakes was afraid that he would be caught with an underage girl when he was not supposed to is irrelevant given the fact that we're not contesting intent."  Id. at 119.

After some more back and forth, the trial court then stated: "I take it from both of your remarks that you agree that the proposed evidence is relevant, and what we're really talking about is whether [it is unduly prejudicial under the] section 352 analysis."  Id. at 122.  The trial court then proposed: "Suppose the admission by the defense or the stipulation by the defense were a little broader than we have been discussing.  Something like the defendant intended to evade the officer because the defendant feared if detained he would be sent to prison."  Id.  The parties argued a bit more, and defense counsel conceded that Pakes' motive was relevant, but insisted that it was only marginally so and was unduly prejudicial.  Id. at 125-26.

After a short recess, defense counsel told the court it was willing to enter into the proposed stipulation.  Id. at 127-28.  The government, however, opposed the stipulation, arguing that Pakes' statements were unusually probative of his intent, and that the proposed language blunted that probative value in various ways.  Id. at 129-30.  The trial court responded:

> I guess we need a little explanation of where the Court is on its legal thinking.
> The Court is inclined to think tentatively that the evidence of motive as
> reflected in the police transcript as well as the police report of Officer Fisher is
> more prejudicial than probative under a evidence code section 352 balancing
> analysis.  However, I would be inclined to permit a stipulation along the lines I
> outlined because the evidentiary content of that stipulation is nearly as
> probative and it's far less prejudicial.  So what I'm really doing is offering the
> People an opportunity to enter into the stipulation rather than to exclude the
> mode of evidence all together.

United States District Court
For the Northern District of California

Id. at 130.  After tinkering with the wording, both parties agreed to the stipulation, which was read to the jury as follows: "[T]he defendant admits that he intended to flee following the traffic accident with another vehicle because he reasonably believed that if he was apprehended by the police, he would be sent to state prison."  4 RT 332.

In his state court habeas petition, Pakes argued that his trial counsel was ineffective for entering into the stipulation.  A claim of ineffective assistance of counsel is cognizable as a claim of denial of the Sixth Amendment right to counsel, which guarantees not only assistance, but effective assistance of counsel.  Strickland v. Washington, 466 U.S. 668, 686 (1984).  The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied upon as having produced a just result.  Id.  The right to effective assistance counsel applies to the performance of both retained and appointed counsel without distinction.  See Cuyler v. Sullivan, 446 U.S. 335, 344-45 (1980).

In order to prevail on a Sixth Amendment ineffectiveness of counsel claim, petitioner must establish two things.  First, he must establish that counsel's performance was deficient, i.e., that it fell below an "objective standard of reasonableness" under prevailing professional norms.  Strickland, 466 U.S. at 687-88.  Second, he must establish that he was prejudiced by counsel's deficient performance, i.e., that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  Id. at 694.  A reasonable probability is a probability sufficient to undermine confidence in the outcome.  Id.

The Strickland framework for analyzing ineffective assistance of counsel claims is considered to be "clearly established Federal law, as determined by the Supreme Court of the United States" for the purposes of 28 U.S.C. § 2254(d) analysis.  See Cullen v. Pinholster, 131 S. Ct. 1388, 1403 (2011); Williams (Terry) v. Taylor, 529 U.S. 362, 404-08 (2000).  A "doubly" deferential judicial review is appropriate in analyzing ineffective assistance of counsel claims under § 2254.  See Pinholster, 131 S. Ct. at 1410-11; Harrington v. Richter, 131 S. Ct. 770, 788 (2011) (same); Premo v. Moore, 131 S. Ct. 733, 740 (2011) (same).  The

**United States District Court**
For the Northern District of California

general rule of <u>Strickland</u>, i.e., to review a defense counsel's effectiveness with great

deference, gives the state courts greater leeway in reasonably applying that rule, which in

turn "translates to a narrower range of decisions that are objectively unreasonable under

AEDPA." <u>Cheney v. Washington</u>, 614 F.3d 987, 995 (9th Cir. 2010) (citing <u>Yarborough v.</u>

<u>Alvarado</u>, 541 U.S. 652, 664 (2004)).  When § 2254(d) applies, "the question is not whether

counsel's actions were reasonable.  The question is whether there is any reasonable argument

that counsel satisfied <u>Strickland</u>'s deferential standard." <u>Harrington</u>, 131 S. Ct. at 788.

On habeas review in state court, Pakes argued that his counsel was ineffective because

the trial court indicated its intent to exclude evidence of his prior convictions and parole

status altogether, but counsel failed to insist that the Court make such a ruling and instead

entered into a prejudicial stipulation where "the natural inference to be drawn from the

stipulation was that petitioner was wanted by the police due to serious criminal conduct other

than the very minor accident on the freeway."  Resp't Ex 6 (state habeas petition) at 26.

The state court rejected that ineffectiveness argument, reasoning that the wording and

context of the trial court's statements indicated that the court was tentatively inclined to

exclude Pakes' statements to the police, not <u>all</u> evidence of his prior convictions and parole

conditions.  <u>See</u> Order, Resp't Ex. 12, at 4.  And, the trial court's tentative ruling was

premised on defense counsel's willingness to admit to intent generally.  <u>Id.</u> at 5-6.

The state court also reasoned that because all of the parties agreed that the evidence

was relevant and undue prejudice was the only issue, the trial court probably would have

admitted a sanitized version of the statement and the fact of Pakes' parole status even if it

followed through on its tentative ruling to exclude Pakes' full statements.  <u>Id.</u> at 7-8.  That

analysis is relevant to both <u>Strickland</u> prongs: counsel's tactical decision was reasonable in

light of how a competent lawyer would understand the Court was likely to rule in light of the

Court's statements regarding the arguments presented, <u>id.</u> at 6-7, and the prejudice to Pakes

was nil, because the probable result of insisting on a ruling would have been the admission of

information more prejudicial than the stipulation.

United States District Court
For the Northern District of California

1    The state court also declined to give much weight to Pakes' trial counsel's declaration

2    offered in support of the habeas petition, which stated that, "upon reflection," counsel had no

3    valid reason for making the stipulation.  Ex. A to Resp't Ex. 6 (declaration).  The state court

4    pointed out that the attorney was highly skilled and had testified in federal court on Pakes'

5    behalf as a <u>Strickland</u> expert on trial tactics and defense strategy in the very same case.  <u>See</u>

6    Order, Resp't Ex. 12, at 6.

7        Pakes argues that the state court's decision denying him habeas relief was "an

8    unreasonable application of clearly established Federal law" for two reasons.  First, he says

9    that the state court "parsed the record in an implausible manner" in concluding that the trial

10   court was tentatively inclined to exclude only Pakes' statements, and not evidence of motive

11   altogether.  Traverse at 13.

12       Pakes' alternative reading of the record relies on selective emphasis and a failure to

13   account for the full discussion among the trial court and the parties.  The trial court first

14   established that the motive evidence was relevant.  Resp't Ex. 2, 2 RT at 122.  Then, after

15   some debate and defense counsel's repeated concessions that Pakes was willing to stipulate

16   to his intent to flee, the trial court indicated that it was "inclined to think tentatively that the

17   evidence of motive <u>as reflected in the police transcript as well as the police report of Officer</u>

18   <u>Fisher</u> is more prejudicial than probative," <u>id.</u> at 130 (emphasis added).

19       Given that language and context, this Court agrees with the state court that the trial

20   court was referring specifically to Pakes' statements to police, and so counsel's tactical

21   decision to enter into the stipulation was reasonable–but this Court's agreement on the merits

22   is beside the point.  Under the "doubly deferential" standard relevant to reviewing a state

23   court's ruling on an ineffective assistance of counsel claim, <u>Harrington</u>, 131 S. Ct. at 788,

24   Pakes must show that the state court's application of <u>Strickland</u> was not just incorrect, but

25   objectively unreasonable.[2]  The state court's ruling certainly rested on a objectively

26   defensible analysis of the record.

27   _____

28       [2]And the state trial court reasonably rejected trial counsel's declaration of no tactical reason for
     the stipulation.  <u>See, e.g.</u>, <u>Harrington</u>, 131 S. Ct. at 790; <u>Edwards v. Lamarque</u>, 475 F.3d 1121, 1126-27
     (9th Cir. 2007).

**United States District Court**
For the Northern District of California

1    Pakes next says that the state court "entirely ignored the fatal prejudice that petitioner

2    suffered as the result of the stipulation."  Traverse at 13.  In Pakes' view, the stipulation itself

3    was highly prejudicial because the jury "was left to imagine all manner of horrible criminal

4    behavior" underlying Pakes' belief that he would be sent to prison if apprehended, and so

5    "counsel had an obligation to reject it even if the consequence was the admission of the

6    evidence that petitioner was on parole and was not allowed to be along with minors,"

7    because "[i]f that evidence had been admitted over defense objection, it is virtually certain

8    that any adverse judgment would have been reversed on appeal." Id. at 12.

9        It is not accurate that no evidence of Pakes' prior conviction or parole condition could

10   have been properly admitted.  See Johnson, 15 Cal. App. 4th at 176-77; Scheer, 68 Cal. App.

11   4th at 1020 n.2; Durham, 70 Cal. 2d at 189.[3]  Trial counsel could reasonably conclude in

12   light of that case law, which was cited by the government during trial, that some evidence of

13   Pakes' prior conviction and parole condition was admissible and, absent the stipulation,

14   likely to be properly admitted to establish Pakes' motive to flee despite the risk of undue

15   prejudice.

16       Pakes next argues that the stipulation itself was highly prejudicial in that the natural

17   inference to be drawn from its wording was that Pakes had committed serious criminal

18   conduct, and in light of the trial testimony that during the chase Pakes told the child to duck

19   down so she would not be seen, the jury probably suspected that he was wanted for an

20   offense relating to children.  Traverse at 5-6.  Trial counsel's choice was between accepting

21   the stipulation, and risking the admission of some unknown level of additional detail about

22   Pakes' prior offense and parole conditions.  While the stipulation may not have erased all

23   traces of suggestion that Pakes was connected to criminal activity involving minors, trial

24   counsel could have reasonably decided that the alternative was almost certainly going to be

25   more suggestive, and thus worse for his client.  Accordingly, the state court reasonably

26

27       [3]The federal district court that granted Pakes' earlier habeas petition did not disagree; rather, that
     court observed that motive evidence was not relevant to the single general intent crime to which Pakes
28   originally pled guilty.  See Resp't Ex. 2, 1 CT at 13-14.  On remand, Pakes faced trial on not just that
     charge, but the specific intent charge of fleeing, which presented an entirely different Evidence Code
     352 balancing question.

1   concluded that trial counsel's tactical decision to enter into the stipulation did not fall below

2   an objective standard of reasonableness.

### B.   The San Jose Police Department Pursuit Policy

4   Pakes' next two claims concern the San Jose Police Department vehicle pursuit

5   policy; specifically, he says the government violated his due process rights by failing to turn

6   it over, and his trial counsel was ineffective for failing to request it.  The written policy

7   provided that an officer could pursue a fleeing motorist when the suspect's "driving behavior

8   is reasonably perceived as being non-hazardous."  Ex. B to Resp't Ex. 6, at 3.[4]

9   In Pakes' view, his trial counsel could and should have used that policy to impeach

10   Officer Gonzalez.  Pakes says that forcing Gonzalez to answer whether he violated the policy

11   in following Pakes would have been helpful regardless of Gonazlez's answer: if Gonzalez

12   said he was within policy because Pakes' driving was "non-hazardous," the government's

13   felony child endangerment case would have been weakened.  If, however, Gonzalez said he

14   violated the policy in pursuing Pakes, then "the jury could well have reasoned that Officer

15   Gonzalez was so upset and biased against petitioner due to the preceding accident that he

16   chose to violate the policy" and that "[g]iven th[at] bias ,the jury may have rejected Officer

17   Gonzalez's testimony" in its entirety.  Traverse at 15.

18   The state court did not present a reasoned opinion in rejecting these claims, so this

19   Court independently reviews the record for a "reasonable basis" for the state court's denial of

20   relief.  Though Pakes presents two independent legal theories for relief premised on the

21   pursuit policy, those two theories have the same prejudice requirement.  For a Brady claim to

22   succeed, (1) the evidence at issue must be favorable to the accused, either because it is

23   exculpatory or impeaching; (2) that evidence must have been suppressed by the prosecution,

24   either willfully or inadvertently; and (3) prejudice must have ensued.  Banks v. Dretke, 540

25   U.S. 668, 691 (2004); Strickler v. Greene, 527 U.S. 263, 281-82 (1999).  For the purpose of

---

4   Though that particular policy applied only to officers driving marked police cars, another policy provided that off-duty officers were "governed by the same policies, procedures, rules and regulations that apply to on-duty personnel in a similar situation."  Id. at 10.

**United States District Court**
For the Northern District of California

**United States District Court**
For the Northern District of California

1  Brady, the terms "material" and "prejudicial" have the same meaning.  United States v.

2  Kohring, 637 F.3d 895, 902 n.1 (9th Cir. 2011).

3      Evidence is material if "there is a reasonable probability that, had the evidence been

4  disclosed to the defense, the result of the proceeding would have been different."  Cone v.

5  Bell, 556 U.S. 449, 469-70 (2009).  "A reasonable probability does not mean that the

6  defendant 'would more likely than not have received a different verdict with the evidence,'

7  only that the likelihood of a different result is great enough to 'undermine confidence in the

8  outcome of the trial.'"  Smith v. Cain, 132 S. Ct. 627, 630 (2012) (quoting Kyles v. Whitley,

9  514 U.S. 419, 434 (1995)).  The mere possibility that undisclosed information might have

10  been helpful to the defense or might have affected the outcome of the trial, does not establish

11  materiality under Brady.  United States v. Olsen, 704 F.3d 1172, 1184 (9th Cir. 2013).  As

12  discussed above, see Part IV.A, ineffective assistance of counsel claims have an identical

13  prejudice requirement.

14      Here, the state court had a reasonable basis for concluding that Pakes did not meet his

15  burden of showing prejudice.  As a threshold matter, and contrary to Pakes' suggestion,

16  Gonzalez's testimony about Pakes' driving was fully corroborated by Adrienne's testimony,

17  and partially corroborated by Sgt. St. Amour, see Resp't Ex. 1, 4 RT 234-52, so the jury was

18  not relying solely on Gonzalez's account in reaching its decision about the dangerousness of

19  Pakes' driving.[5]

20       Moreover, juries are no strangers to American roadways, and they need little, if any,

21  assistance in deciding whether a particular form of driving is "hazardous" or "dangerous."

22  All the jury needed to know to decide on Pakes' guilt–and what it was told, and what it still

23  would have been told by three different witnesses even if Pakes' attorney possessed and used

24  the pursuit policy in questioning Gonzalez–was exactly how Pakes was driving.  Gonzalez

25

26          [5]Pakes points out two details in Adrienne's testimony that were arguably contradicted by other
    evidence in the record, and concludes that the jury would have seized on those two instances of
27  disagreement and disregarded her testimony entirely.  Rare indeed is the trial where every witness
    recounts the same set of events in exactly the same way, and Pakes has no grounds for concluding that
28  the bare existence of two discrepancies in dozens of recounted facts would substantially implicate, let
    alone wholly undermine, Adrienne's credibility.

United States District Court
For the Northern District of California

was never asked to opine how he would characterize Pakes' driving, likely because he was in no better position than the jury to make that judgment; indeed, it is unclear that such an opinion would even be admissible on the merits of the criminal charges. See Cal. Evid. Code § 800(b) (requiring lay opinion testimony be "[h]elpful to a clear understanding of [the] testimony"). Even if Gonzalez were permitted to offer such an opinion on the merits, the jury's ability to assess Pakes' driving on its own provided the state court a reasonable basis for concluding that there was not a reasonable probability that the jury would have wholly substituted Officer Gonzalez's characterization for its own judgment.

Pakes also posits that if Gonzalez had admitted to violating department policy by pursuing someone driving "hazardously," then the jury would probably have disregarded everything Gonzalez had to say. That makes little sense. Officer Gonzalez's admission that he violated policy in pursuing Pakes would make clear that he very much wanted to catch Pakes, which would be no surprise to the jury. It would not be inherently suggestive of a bias to lie about Pakes' actions while fleeing. The state court thus had a reasonable basis for concluding that a jury would not view an admission that Officer Gonzalez violated policy as reflecting meaningfully on the credibility of his description of Pakes' driving.[6]

Accordingly, this Court concludes that the state court had a reasonable basis for denying Pakes relief on the ground that he failed to meet his burden of establishing prejudice.

### C.   False Testimony

According to Pakes, "Officer Gonzalez lied in two respects during his testimony: (1) he falsely asserted that he did not drive the wrong way on a one way street nor did he see petitioner do so; and (2) he falsely testified that he pulled over when he saw Sergeant St. Amour." Traverse at 25. Pakes hypothesizes that "the goal of the false testimony was to conceal from the jury that Officer Gonzalez drove in exactly the same manner as petitioner" because "[i]f the jury had known this fact, it would have been very difficult for the

---

[6] Also, as the government points out, Pakes' argument would likely do him more harm than good. To demonstrate that Officer Gonzalez's departure from department guidelines was so flagrant as to potentially call into question his credibility concerning the entire incident, Pakes would have to argue that his own driving was so bad that Gonzalez's decision to chase him reflected a consuming bias–hardly a useful argument for Pakes in the grand scheme of the case.

prosecutor to seriously contend that petitioner's driving was sufficiently dangerous to warrant felony convictions." <u>Id.</u> at 27.[7]  Pakes says the government's use of that allegedly false testimony to convict him violated his due process rights.

"[A] conviction obtained by the knowing use of perjured testimony is fundamentally unfair, and must be set aside if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury." <u>United States v. Agurs</u>, 427 U.S. 97, 103 (1976).  So must a conviction obtained by the presentation of false evidence.  <u>See</u> <u>United States v. Bagley</u>, 473 U.S. 667, 678-80 nn.8-9 (1985).  In addition, a conviction obtained through false evidence includes not only perjured testimony, but also false documents or other forms of admissible evidence.  <u>See</u> <u>Napue v. Illinois</u>, 360 U.S. 264, 269 (1959).

The state court did not present a reasoned opinion in rejecting these claims, so this Court independently reviews the record for a "reasonable basis" for the state court's denial of relief.  Two present themselves: the two disputed facts were so unrelated to Pakes' guilt or innocence that there is no "reasonable likelihood that the false testimony could have affected the judgment of the jury," and Pakes has not established that Officer Gonzalez's testimony was actually false.

Putting aside for a moment its truth or falsity, the testimony at issue had little to do with Pakes' conviction.  Pakes says that Gonzalez lied by saying that he never saw Gonzalez drive the wrong way down a one-way street, but in its closing argument the prosecutor relied on other evidence in urging the jury to conclude just the opposite–that in fact Pakes had driven the wrong way down a one-way street.  <u>See</u> 5 RT 386-87.  Pakes thus cannot and does not suggest that the government relied on that alleged falsehood to convict him.

Instead, Pakes makes the far-fetched argument that the prosecutor elicited that testimony, which was contrary to its theory of the case, in a scheme to conceal Gonzalez's other supposedly false testimony that Gonzalez did not himself follow Pakes the wrong way

---

[7]Under California law, the child endangerment and evasion charges turned on the danger posed by Pakes' driving; had the jury concluded that the driving was dangerous but not likely to produce great bodily harm or death, it could have convicted him of misdemeanor-level endangerment.  Likewise, the difference between misdemeanor and felony evading is whether the driving was reckless.

1   down a one-way street.  In Pakes' view, the jury would not have found his driving dangerous

2   enough to warrant felony convictions if it knew that Gonzalez–who was off-duty and driving

3   with his spouse in the car at the time of the incident–drove the same way.

4          The issue before the jury was the danger posed to Adrienne and to the public by

5   Pakes' driving; the dangerousness of Gonzalez's conduct in following him was of little, if

6   any, relevance to that inquiry.  Adrienne was in Pakes' car, not Gonzalez's.  The evidence

7   reflected that Pakes, not Gonzalez, cut off other cars and forced them to swerve to avoid a

8   head-on collision.  Accordingly, it is hard to imagine a jury reaching a different conclusion

9   based on its conclusions about what Gonzalez did or did not do in pursuing Pakes.

10          Moreover, this Court need not speculate on how the jury would have evaluated Pakes'

11   theory–it already heard it.  The jury was well aware that Gonzalez was following Pakes for

12   much of the chase, and Pakes' trial counsel argued in closing that Gonzalez was biased by his

13   "ego," the presence of his spouse, and a desire "not . . . to let somebody get away with" the

14   hit-and-run.  5 RT 403, 413.  Defense counsel also argued that Gonzalez's testimony about

15   the chase on the surface streets contradicted the accounts of Sgt. St. Amour and Adrienne.

16   Id. at 414.  The jury had all of the evidence and argument it needed to conclude that

17   Gonzalez shaded his testimony to put his own driving in a better light.

18          Nevertheless, after hearing evidence that Pakes fled the collision scene by driving an

19   unbelted 12-year-old girl on the shoulder of the freeway in congested traffic, weaving in and

20   out of lanes, and cutting off other cars; and that on surface streets he sped and drove the

21   wrong way down one-way streets, forcing oncoming traffic to swerve out of the way to avoid

22   him, the jury convicted him of felony-level endangerment and evasion.  See 4 RT 238, 295-

23   96, 5 RT 383-84.  The de minimis relevance of Gonzalez's driving conduct, and the fact that

24   the jury already rejected Pakes' theory that Gonzalez's account was untrustworthy, provided

25

26

27

28

1  reasonable grounds for the state court to conclude that there was no "reasonably likelihood"

2  the jury's verdict was affected by the supposedly false evidence.[8]

3      In addition, Pakes has not established that Gonzalez's testimony was false. He says it

4  contradicted the written transcript of the San Jose police dispatch log of the incident on the

5  relevant points. As a threshold matter, discrepancies in trial testimony about details from

6  incidents long since past–here, Gonzalez testified in November 2007 about the December

7  2001 incident–"could as easily flow from errors in recollection as from lies." United States v.

8  Zuno-Arce, 44 F.3d 1420, 1423 (9th Cir. 1995). To the extent Gonzalez's testimony was

9  inaccurate, Pakes has no basis for arguing it was deliberately so.

10      In fact, Gonzalez's testimony on the points in question was equivocal and phrased in

11  terms of his present recollection, making especially difficult a showing that his answers were

12  literally false. Defense counsel asked Officer Gonzalez if he drove the wrong way down a

13  one-way street, and Gonzalez answered "I don't think so, no." 4 RT 285. And when asked if

14  he saw Pakes drive the wrong way on a one-way street, Gonzalez answered, "Uh – not that I

15  can remember, no." Id. Even if Pakes and Gonzalez both drove the wrong way down a one-

16  way street, it does not necessarily or even probably follow that it was false that six years

17  later, Gonzalez did not think he did or could not remember Pakes doing so. Gonzalez's

18  equivocation provided a reasonable ground for concluding that his testimony was not false.

19  If the testimony was, in fact, false, the jury had reason not to rely much on the statements

20  based on their equivocal nature, further undermining any showing of prejudice.

21      Also, the dispatch log said nothing about whether Gonzalez pursued Pakes against

22  traffic; Pakes' theory that Gonzalez lied about that fact is speculative. The log discussed

23  Pakes' movements, not Gonzalez's. Pakes assumes that Gonzalez could only have reported

24  Pakes' movements from a position more or less directly behind him, but Gonzalez's

25  _____

26      [8]Pakes suggests indirectly that the jury would have disregarded Gonzalez's testimony generally
    if it knew about the alleged falsehoods. Whether that is a cognizable theory of prejudice on a false

27  evidence claim is not entirely clear, and anyway it would fail for the same reasons Pakes' pursuit policy
    violation theory failed–the jury was not relying solely on Gonzalez for the relevant facts, and the alleged

28  discrepancies are not suggestive of untruthfulness about Pakes' conduct. Additionally, Pakes offers no
    theory at all for how Gonzalez's alleged falsehood that he pulled over when he saw Sgt. St. Amour
    prejudiced him, and this Court discerns none.

United States District Court
For the Northern District of California

1    testimony was that he was trailing Pakes by a considerable distance during the pursuit, 4 RT

2    269-70, 282, and given Pakes' horseshoe-shaped path, Gonzalez could have observed Pakes

3    making the turns on to the one-way streets without himself making those movements.  See 4

4    RT 282-85; Answer at 31:26 - 32:13 (explaining route possibilities).

5        Moreover, Sgt. St. Amour testified to what drew his attention to Pakes' pickup in the

6    first place, and if Gonzalez had been behind Pakes while he drove the wrong way down the

7    one-way streets, presumably St. Amour would have testified that he observed the chase in

8    progress.  But that is not what Sgt. St. Amour said.  Rather, he testified that he first noticed

9    Pakes' headlights–not two sets of headlights–traveling the wrong way down a one-way

10   street.  4 RT 292-98.  Also, in cross-examining St. Amour, defense counsel focused on

11   whether St. Amour saw other cars on the one-way street as Pakes approached St. Amour

12   driving the wrong way, and St. Amour made no mention of any other cars–i.e.,

13   Gonzalez's–behind Pakes.  Id. at 318-19.

14       As for Pakes' theory that Gonzalez lied about where he pulled over, Gonzalez's vague

15   testimony did not conflict with the dispatch log.  At trial, defense counsel asked Gonzalez

16   what he did after seeing the marked police car, and Gonzalez responded "At that point I just

17   pulled over."  Counsel pressed, "On Keyes?"  Gonzalez replied, "We were already on Keyes,

18   so I don't know if I pulled over on Keyes or onto one of the side streets.  I'm not sure.

19   Somewhere right in the area we pulled over."  4 RT 284.  The dispatch log indicates that at

20   5:51 p.m.,  Gonzales told the dispatcher he saw the marked police car ("RP[9] sees SJPD

21   unit"), and also at 5:51 p.m., he told the dispatcher he was following the marked police car

22   ("RP now following PD").  That Gonzalez followed the marked unit for some short period of

23   time after first seeing him is not inconsistent with him pulling over "somewhere right in the

24   area" as he testified at trial.

25       Pakes also argues that a footnote in Cullen v. Pinholster, 131 S. Ct. 1388, 1402 n.12

26   (2011), means that Pakes definitively established that Officer Gonzalez lied merely because

27   Pakes alleged so in his state habeas petition, and "this court is required to accept th[o]se facts

28

---

[9]"RP" is a common abbreviation for "reporting party" in law enforcement records.

United States District Court
For the Northern District of California

as proven." Traverse 25-26. <u>Pinholster</u> said no such thing. Rather, it explained that under California law the California Supreme Court's summary denial of a habeas petition reflects "that court's determination that the claims made in the petition do not state a prima facie case entitling the petitioner to relief," and that in making that determination, the court "generally assumes the allegations in the petition to be true, but does not accept wholly conclusory allegations." <u>Pinholster</u>, 131 S. Ct. at 1402 n.12.

Pakes alleged in his state habeas petition that "Officer Gonzalez testified falsely." Petition, Resp't Ex. 15 at 11. As <u>Pinholster</u> made clear, such conclusory allegation are not accepted as true under California law for purposes of ruling on the petition. Accordingly, Pakes' bare conclusion that Gonzalez lied was not magically transformed into irrefutable fact by virtue of the denial of his petition without elaboration on that point. To the extent Pakes also alleged in more detail the supposed contradiction in the record evidence that he believed reflected Officer Gonzalez's untruthfulness, <u>see</u> <u>id.</u> at 11-12, the state court's denial reflected a rejection on the merits of that theory, and this Court has already explained the reasonable basis the state court had for doing so.

### D.     Cumulative Error

Pakes says the cumulative prejudice from the three theories just discussed–the <u>Strickland</u> claim based on the stipulation, the <u>Brady</u>/<u>Strickland</u> claims based on the pursuit policy, and the false evidence claim–warrants reversal. In some cases, although no single trial error is sufficiently prejudicial to warrant reversal, the cumulative effect of several errors may still prejudice a defendant so much that his conviction must be overturned. <u>E.g.</u>, <u>Alcala v. Woodford</u>, 334 F.3d 862, 893-95 (9th Cir. 2003).

Here, a big-picture review of the case against Pakes only underscores how inconsequential the asserted errors–if any–were. This was a case about the degree of danger posed by Pakes' actions in fleeing from the scene of the accident with an unbelted minor in his car. Accordingly, the critical evidence was the evidence of exactly how Pakes drove that day. The errors Pakes asserts in his petition concern Officer Gonzalez's driving, whether that driving complied with police policy, and whether Gonzalez himself accurately recounted his

driving during trial–none of which suggest that the jury heard an inaccurate account of how Pakes drove.

### E. Jury Instruction on Basic Speed Law

Pakes further claims that the judge committed reversible error by incorrectly instructing the jury with regard to an element of § 2800.2, fleeing a pursuing police officer. A felony conviction for this offense may be obtained under either of two theories: (1) that the defendant drove with a willful or wanton disregard for the safety of persons or property, or (2) that the defendant committed three or more traffic violations while fleeing the pursuing officer.  Cal. Veh. Code § 2800.2.  In this case, the jury was instructed on both theories.  5 RT 371.

Although the jury was instructed on five underlying traffic violations to support conviction on the latter ground, only one is at issue: Pakes' violation of the basic speed law.  Traverse at 32.  According to Pakes, "Instead of instructing the jury that the government had to disprove the defense by proof beyond a reasonable doubt, the court advised the jury that [Pakes] bore the burden of proving the defense."  Id.  Indeed, the court instructed the jury that "the speed of any vehicle . . . in excess of the posted speed limit is unlawful unless the defendant establishes by competent evidence that the speed . . . did not constitute a violation of the basic speed law at the time, place and conditions that existed."  5 RT 372.  Pakes alleges that, in doing so, the court "impermissibly shifted the burden of proof with respect to an affirmative defense to one of the predicate traffic infractions offered in support of the crime."  Answer at 34.

The state court did not resolve whether the instruction itself was erroneous, but concluded that any error would have been harmless beyond a reasonable doubt.  In the view of the state court, the evidence that Pakes was driving "at a speed greater than was reasonable or prudent" was overwhelming: Pakes "was driving his truck over the posted speed limit at night in a residential neighborhood with a minor, who was not wearing a seatbelt, in the front seat.  There was also an unsecured ladder in the back of the truck, which shifted as he turned the truck."  Resp. Ex. 9 at 26-27.  Based on this evidence, the state court concluded that "any

United States District Court
For the Northern District of California

error in the instruction regarding [Pakes'] affirmative defense was harmless beyond a reasonable doubt." Id. at 27.

Pakes contends that the harmless error analysis is moot, because a misinstruction with regard to the burden of proof necessarily constitutes structural error, which is reversible per se. Traverse at 32. However, the Ninth Circuit has repeatedly rejected claims that the kind of burden shifting at issue here is structural error, and instead analyzed such claims for harmless error. See McKenzie v. Risley, 801 F.2d 1519, 1525 (9th Cir. 1986); Herd v. Kincheloe, 800 F.2d 1526, 1528-29 (9th Cir. 1986); Ybarra v. Wolff, 662 F. Supp. 44, 46 (D. Nev. 1987).

Pakes further argues that the error was not harmless. First, he posits that he clearly complied with the basic speed law, as he was driving only five miles per hour over the posted limit, and nothing indicated that the unsecured ladder posed a risk. Traverse at 33. Considering Pakes' driving as a whole, the state court was reasonable in concluding that the evidence was overwhelming that he drove "at a speed greater than is reasonable or prudent having due regard for" the conditions.

Second, Pakes contends that the evidence as to three of the four remaining traffic violations was subject to legitimate dispute. He admits that the seatbelt violation is uncontested, but claims that a jury could have easily rejected the other three allegations, because, he says: (1) he did not drive on the wrong half of the road, but merely parked there, (2) there was no failure to signal due to the absence of cars in proximity to the turning vehicle, and (3) his jaunt in the wrong direction on a one-way street occurred before pursuit by a police officer began. Traverse at 33-34. Those challenges are legal, not factual, and were rejected by the state court, which has the final say on interpretation of state law. Thus, Pakes has not actually identified any weaknesses in the evidence regarding the remaining violations, making the speeding issue moot.

In addition, the details of Pakes' driving, recounted above, overwhelmingly established his guilt under the alternate theory of liability for § 2800.2: exhibiting a wanton

United States District Court
For the Northern District of California

1  or willful disregard for the safety of persons or property during the police chase, providing an

2  alternative reason that error regarding the speeding instruction would be harmless.[10]

3       **F.       Jury Instruction on § 21650**

4       Finally, Pakes contends that the trial court erred in instructing the jury that it could

5  rely on § 21650 in establishing one of the three underlying traffic violations for a conviction

6  under § 2800.2, fleeing a pursuing police officer.  Traverse at 35.  Pakes argues that he did

7  not "drive" on the wrong (left) side of the road, but simply "parked" there.  He says the

8  parking may have been unlawful, but the turn itself was legal.  Id. at 36.

9       Notwithstanding the merits of his interpretation of the state traffic infractions at issue,

10 Pakes fails to state a federal claim for which habeas relief may be granted.  Federal courts are

11 bound by a state court's construction of a statute and may not reinterpret state law.  Estelle v.

12 McGuire, 502 U.S. 62, 67-68 (1991).  While Pakes claims that he merely parked illegally, the

13 state court rejected his argument by finding that "the act of traveling over the curb was

14 sufficient to constitute driving."  Resp. Ex. 9 at 21-22.  Because this Court is bound by the

15 state court's interpretation of the California Vehicle Code, Pakes fails to state a cognizable

16 claim for federal habeas relief.

17       **IT IS SO ORDERED.**

18

19

20 Dated: July 29, 2013                                   CHARLES  R. BREYER
                                                        UNITED STATES DISTRICT JUDGE
21

22

23

24

25

26      [10] Pakes argues that the jury did not rely on this alternate theory of liability in reaching their
   decision, but rather considered the 'three violation' theory, because the jury asked for a rereading of
27 testimony relevant to determining the lane the defendant was driving in before making his final left hand
   turn.  Traverse at 34 (internal quotations omitted).  While Pakes is correct that the jury clearly
28 considered the 'three violation' theory, nothing can be reliably inferred regarding which theory it
   ultimately relied on in reaching its verdict.